# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

TINA MANCHESTER,

       Plaintiff,

v.                                                                       CV 13-772 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Tina Manchester applied for disability insurance benefits on January 20, 2011, based on severe depression, anxiety, social phobia, anger, paranoia, destructive tendencies, high blood pressure, and diabetes. (Administrative Record ("AR") 129, 174.) After her application was denied at all administrative levels, she brought this proceeding for judicial review. The case is before me now on Manchester's Motion to Reverse and Remand for a Rehearing, the Commissioner of the Social Security Administration's ("SSA") response, and Manchester's reply. (Docs. 21-23.) For the reasons explained below, I grant Manchester's motion and remand this case to the SSA for proceedings consistent with this opinion.

### STANDARD OF REVIEW

When the Appeals Council denies a claimant's request for review, the Administrative Law Judge's ("ALJ") decision is the SSA's final decision. In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004)

(citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (citation omitted).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 404.1520. If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the claimant bears the burden of showing (1) that she is not performing a substantial gainful activity; (2) that she has an impairment severe enough to significantly limit her ability to do basic work activities; and (3) that her impairment or impairments, individually or in the aggregate, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

 If the claimant does not satisfy the third prong, the ALJ must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. § 404.1520(e). An RFC assessment requires two steps: first, determining whether

there is an underlying medically determinable physical or mental impairment or impairments that could reasonably be expected to produce the pain or symptoms; and second, evaluating the intensity, persistence, and limiting effects of all medically determinable impairments to determine the extent to which they limit the claimant's functioning. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013). In cases where symptoms such as pain are alleged, the RFC determination must be supported by a thorough discussion and analysis of the objective medical evidence and other evidence, including the individual's complaints; resolve any inconsistencies in the evidence as a whole; and set forth a logical explanation of the effects of the symptoms on the individual's ability to work. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).[1] Credibility determinations on a claimant's report of symptoms must contain specific reasons for the finding on credibility and be sufficiently specific to make clear to the individual or subsequent reviewers what weight the ALJ gave to the individual's statements and the reasons for that weight. SSR 96-7p, 1996 WL 374186, at *4-5.

At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25; 20 C.F.R. § 404.1520(a)(4)(i-iv). At the fifth step, the burden shifts to the Commissioner to show that the claimant is capable, based on her vocational factors, of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25.

---

[1] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

### FACTUAL BACKGROUND

Manchester is a fifty-four-year-old woman with a college education. (AR 41, 60, 175.) She worked as a medical technologist for various laboratories from 1986 until 2003 (AR 165) and as an inventory specialist from 2004 to 2006 (AR 154, 165). Manchester claims disability beginning on November 23, 2003, based on severe depression, anxiety, social phobia, anger, paranoia, destructive tendencies, high blood pressure, hypothyroidism, and diabetes. (AR 68, 174.) At the time of her application, Manchester was prescribed alprazolam,[2] levothyroxine,[3] Lexapro,[4] lisinopril,[5] and Tylenol (for headaches). (AR 177.)

Manchester has an extensive medical record, particularly relating to her psychological ailments. Manchester also has a criminal record, with all of her criminal conduct appearing to stem from untreated psychological conditions. Her earliest submitted documents come from Presbyterian Hospital ("Presbyterian"), dated May 1990. (AR 704-723.) Manchester was admitted to the Presbyterian emergency department for a Tylenol overdose on May 16, 1990. (AR 704.) She reportedly took more than two hundred extra-strength Tylenol pills and went for a drive. (*Id.*) Manchester was in the hospital for five days, given charcoal for the overdose, and

---

[2] "Alprazolam" is commonly known by the brand name Xanax. Alprazolam is a benzodiazepine used to treat anxiety and panic disorders, as well as depression. *Alprazolam*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html (last visited Nov. 3, 2014).

[3] "Levothyroxine" is a thyroid hormone used to treat hypothyroidism. *Levothyroxine*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html (last visited Nov. 3, 2014).

[4] "Lexapro" is the brand name for escitalopram. Escitalopram is a selective serotonin reuptake inhibitor used to treat depression and generalized anxiety disorder. *Escitalopram*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html (last visited Nov. 3, 2014).

[5] "Lisinopril" is an angiotensin-converting enzyme inhibitor used to treat high blood pressure. *Lisinopril*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html (last visited Nov. 3, 2014).

noted for having a blunted affect and "significant depression." (AR 749-754, 777-805.) She reported taking the Tylenol after an argument with her then-boyfriend. (AR 778.)

On April 13, 1991, Manchester overdosed on Klonopin[6] and was evaluated again at Presbyterian. (AR 763.) She stated that she was upset and could not sleep, but denied suicidal intent. (AR 763.) She did, however, admit to depression and depressive symptoms. (*Id.*) She returned the next day for a follow-up psychological evaluation and was diagnosed with depression. (AR 768.)

Manchester was again admitted to Presbyterian on September 9, 1991. (AR 756.) A Psychiatric Nursing Intake Interview from that date describes Manchester as angry and hostile, with a flat affect and paranoid thought content toward staff and her husband. (AR 755-56.) She exhibited isolative behavior and dissociative states, with the potential for self-injury. (AR 758, 760.)

James Jaramillo, M.D., evaluated Manchester during her September 1991 stay at Presbyterian and prescribed Mylicon,[7] desipramine,[8] and Trilafon[9]. (AR 807-10.) Dr. Jaramillo diagnosed Manchester with major depression with psychosis and/or incongruent features; a personality disorder, possibly schizoid; and abnormal cortisols, indicating a neurochemical

---

[6] "Klonopin" is the brand name for clonazepam. Clonazepam is a benzodiazepine used to control certain types of seizures and to relieve panic attacks. *Clonazepam*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html/ (last visited Nov. 3, 2014).

[7] "Mylicon" is a brand name for simethicone. Simethicone is used to treat symptoms of gas, including uncomfortable or painful pressure, fullness, and bloating. *Simethicone*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682683.html (last visited Nov. 3, 2014).

[8] "Desipramine" is a tricyclic antidepressant used to treat depression. *Desipramine*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682387.html (last visited Nov. 3, 2014).

[9] "Trilafon" is the brand name for perphenazine. Perphenazine is a conventional antipsychotic used to treat the symptoms of schizophrenia, and to control severe nausea and vomiting in adults. *Perphenazine*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682165.html (last visited Nov. 3, 2014).

depression. (AR 809-10.) Dr. Jaramillo's notes indicate that the laboratory data showed "a neurochemical depression." (AR 808.) Clinical impressions included "a blunted affect and . . . some schizoid tendencies, that of withdrawal, episode of anger towards her husband and her family." (*Id.*) Dr. Jaramillo also performed a Mental Status Examination on Manchester at discharge. He noted that she had a flat affect and did not engage eye contact; she was withdrawn, taciturn, and minimally communicative; and her mood showed significant depression, characterized by insomnia, weight loss, and depressive demeanor. (AR 809.) Dr. Jaramillo described Manchester's affect during her hospital stay as "inappropriate and blunted" and her speech as slow. (*Id.*) Manchester was discharged on September 12, 1991. (AR 807.)

On November 13, 1991, Manchester was again admitted to Presbyterian's emergency room. (AR 811.) Samir Roy, M.D., oversaw her care and noted that, at the time of admission, Manchester was "in a state of extreme agitation and also depression." (AR 811.) Manchester's husband reported that she had recently been off from work due to her escalating depressive symptoms with psychoses. (*Id.*) Dr. Roy conducted a Mental Status Evaluation and noted that Manchester exhibited a blunted affect with depressed mood. (*Id.*) She "show[ed signs of] irritability, agitation, and anger toward her surroundings. She sa[id] she ha[d] been hearing voices and . . . her voices [were] 'down'. [She] ha[d] poor concentration and comprehensive abilities." (*Id.*) Dr. Roy described Manchester's insight and judgment as "impaired." (*Id.*) Dr. Roy diagnosed Manchester with major depression with psychotic features and a possible schizoid personality disorder, with a GAF of 40.[10] (AR 811-12.)

---

[10] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between thirty-one and forty is assessed when the patient is believed to have "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations,

Manchester returned to Presbyterian's emergency room on March 19, 1995, complaining of nausea and dizziness after overdosing on Stelazine.[11] (AR 1204, 1205, 1207.) Manchester claimed that she did not overdose to hurt herself, but that she was upset with her husband. (AR 1204.) The emergency room administered charcoal to help handle the overdose. (AR 1205.) Clinician's notes indicate that Manchester had a history of depression and was exhibiting "suicidal gestures." (AR 1206.)

On March 21, 1996, Manchester was again admitted to the emergency room at Presbyterian. (AR 1213.) She complained of slow-onset lower abdominal cramping with bloody stool, but was ultimately discharged without serious complications. (AR 1214.)

Manchester was seen at the emergency room at Presbyterian's Anna Kaseman Hospital ("Kaseman") on March 12, 1998, complaining of depression and dizziness. (AR 645.) She complained of insomnia and suicidal ideation, with a history of depression, hypertension, and hypercholesterolemia. (AR 646.) Manchester reported her current medications as Serzone,[12] Risperdal,[13] Valium,[14] and Lipitor[15]. (*Id.*) Carolyn Bryan, M.D. described Manchester as having an "extremely flat affect." (*Id.*)

---

judgment, thinking, or mood." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Manchester's mental health providers used this scoring method.

[11] "Stelazine" is the brand name for trifluoperazine. Trifluoperazine is a conventional antipsychotic used to treat the symptoms of schizophrenia and, on a short-term basis, to treat anxiety. *Trifluoperazine*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682121.html (last visited Nov. 3, 2014).

[12] "Serzone" is the brand name for nefazodone. Nefazodone is a serotonin modulator used to treat depression. *Nefazodone*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695005.html (last visited Nov. 3, 2014).

[13] "Risperdal" is the brand name for risperidone. Risperidone is an atypical antipsychotic used to treat the symptoms of schizophrenia, mania, bipolar disorder, aggression, and self-injury. *Risperidone*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html (last visited Nov. 3, 2014).

Manchester had a biopsy of her left-breast tissue on October 13, 2000. (AR 610-612.) Treatment notes by Gopal K.N. Reddy, M.D., dated September 17, 2000, in advance of the biopsy, report that Manchester had a medical history significant for hypertension and severe depression. (AR 613.) Manchester was taking Depakote,[16] Zestril,[17] Celexa,[18] ibuprofen, and Tylenol. (*Id.*) The biopsy came back clear. (AR 612.)

On May 11, 2001, Manchester had a septoplasty to relieve "heroic snoring." (AR 690.) On February 2, 2002, William Henderson, M.D., Manchester's long-time primary care physician, noted that Manchester had anger control problems. (AR 378.) She was treated at Lovelace Women's Hospital on December 7, 2002, for conjunctivitis in the eyes. (AR 268-72.)

Dr. Henderson treated Manchester for anxiety and depression, with prescription records dating back to at least 2004. (AR 331, 335, 337, 341-43, 345, 349, 350, 353, 355, 356-57, 359, 368, 378-79.) In November 2008, Dr. Henderson noted that Manchester had uncontrolled diabetes and referred her to a diabetes educator. (AR 340.) On January 23, 2009, he noted that Manchester was not complying with her prescribed medications because she had no health insurance and could not afford the prescriptions. (AR 341.)

---

[14] "Valium" is the brand name for diazepam. Diazepam is used to treat anxiety, muscle spasms, and seizures. *Diazepam*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html (last visited Nov. 3, 2014).

[15] "Lipitor" is the brand name for atorvastatin. Atorvastatin is an HMG-CoA reductase inhibitor used to help treat high cholesterol and heart disease. *Atorvastatin*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600045.html (last visited Nov. 3, 2014).

[16] "Depakote" is a brand name for valproic acid. Valproic acid is an anticonvulsant used to treat mania in individuals with bipolar disorder, to prevent migraine headaches, and to treat certain types of seizures. *Valproic Acid*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (last visited Nov. 3, 2014).

[17] "Zestril" is a brand name for lisinopril. See, *supra*, note 5.

[18] "Celexa" is the brand name for citalopram. Citalopram is a selective serotonin reuptake inhibitor used to treat depression. *Citalopram*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699901.html (last visited Nov. 3, 2014).

Manchester was admitted to Lovelace Medical Center on April 19, 2009, for self-injurious behavior and the ingestion of seven Xanax. (AR 279-91.) Manchester denied suicidal intent and stated that she "want[ed] to go to sleep." (AR 279.) Clinical impressions included a depressed mood, blunted or flat affect, slow speech, poor concentration, and difficulty falling asleep. (*Id.*) Manchester had to be restrained, as she posed an imminent threat to herself or others, and was violent, aggressive, or destructive. (AR 515.) At intake, Manchester gave a diagnostic impression of alcohol abuse, hypertension, diabetes, and an anxiety disorder by history, with a GAF of 41.[19] (AR 279.) Her husband reported frequent "meltdowns." (AR 513.)

On July 12, 2009, officers were called to the Manchester residence. (AR 223-30.) Manchester stabbed her husband in the arm and was subsequently charged with aggravated battery against a household member with a deadly weapon. (*Id.*)

Manchester experienced a syncopal episode at a Walmart on August 1, 2009, and was seen at the University of New Mexico Hospital. (AR 389.)

On September 8, 2009, Dr. Henderson again noted that Manchester could not afford her medication. (AR 331.) From September 2009 to March 2010, Dr. Henderson called in samples of diabetes and cholesterol medication for Manchester. (*Id.*)

Police were again called to the Manchester house on January 6, 2010, following reports that Manchester was harassing her neighbors and had engaged in criminal damage to property. (AR 231, 481-83.) Officers called paramedics after they found Manchester in the street, drunk and stumbling, following the argument with her neighbors. (AR 315.) Manchester was restrained by emergency medical personnel en route to the hospital because of severe aggression, acute

---

[19] A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005).

aggression, destructiveness, and violent or combative outbursts. (AR 495-96.) The EMS report noted homicidal ideations, agitation, combativeness, suicidal ideations, and an altered mental status. (AR 507.)

Manchester was admitted to Kaseman that evening, with lacerations on her fingers and requesting a behavioral health consultation. (AR 315.) She received sutures for the lacerations on her fingers (*id.*) and was noted to have anxiety and depression (AR 318, 324). Manchester was released the morning of January 7, 2009. (AR 315-25.) Emergency services were again dispatched to the Manchester home on January 7, 2009, and transported Manchester to Kaseman's emergency room. (AR 477-80.) She was admitted to the emergency room for depression and alcohol intoxication. (AR 456-57.)

On March 6, 2010, Manchester was again admitted to Kaseman. (AR 298-310.) Manchester presented with a depressed mood, blunted affect, helpless/hopeless and worthless thought content, and trouble concentrating. (AR 300.) Manchester had overdosed on Xanax and alcohol, stating that she had been angry at her husband and denying suicidal intent. (*Id.*) She reported being a frequent "cutter"—engaging in self-injury by cutting her skin—with the most recent event being two weeks prior. (AR 301.) Ann Duffy, RN, assessed Manchester with a non-specified mood disorder, alcoholism, and a GAF of 45. (AR 303.)

Manchester presented at the University of New Mexico Health Center ("UNM Health") on April 12, 2010, while intoxicated and complaining of depression and suicidal intent. (AR 385-

86.) Cristobel Rendall, M.D., performed a Behavioral Health Psychiatric Emergency Services Evaluation on Manchester and assessed her with a GAF of 25.[20] (AR 399-400.)

On April 16, 2010, she again presented at the emergency room complaining of akathisia—restlessness and feeling as though she had to move. (AR 382.) She was admitted to UNM Health overnight and had another emergency evaluation on April 17, 2010. (AR 396-97.) Peggy Rodriguez, M.D., assessed Manchester with continued symptoms of anxiety, fear of going out in public places, fear of talking to people, fear that people will follow her in her car, and a history of kleptomania. (*Id.*) Dr. Rodriguez noted that Manchester had a past diagnosis of schizoaffective disorder, bipolar type, and then diagnosed her with alcohol abuse, benzodiazepine abuse, impulse control disorder, hypertension, diabetes, syncopal attacks, hypothyroidism, drug-induced akathisia, and a history of kleptomania, with a GAF of 45. (*Id.*)

Manchester made harassing phone calls to her previous employer on February 7, 2011, informing the staff that she was still upset about her firing some five years earlier and was going to kill them. (AR 232.) She then assaulted her husband with a knife. (AR 233-35.)

Shannon Stromberg, M.D., with Psychiatric Emergency Services at Presbyterian, performed a mental status exam on Manchester on February 10, 2011. (AR 576-77.) Dr. Stromberg assessed Manchester with depression and anxiety, as well as alcohol and benzodiazepine abuse by history, with a GAF of 55.[21] (AR 576.)

On February 28, 2011, Alexis Hinds, M.D., with Presbyterian, noted that Manchester had a non-specified impulse control disorder, depressive disorder, anxiety disorder, and GAF of 40.

---

[20] A score between twenty-one and thirty is assessed when the patient is believed to be "considerably influenced by delusions or hallucinations OR serious[ly] impair[ed] in communication or judgment . . . OR [unable] to function in almost all areas." *Id.*

[21] A score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *Id.*

(AR 592-94.) In an evaluation later the same day, Dr. Hinds assessed Manchester with a GAF of 50. (AR 590.) April 1, 2011, Dr. Hinds assessed Manchester with a non-specified anxiety disorder, a provisional diagnosis of borderline personality disorder, and a GAF of 43. (AR 587-88.)

Also on April 1, 2011, agency consultant Allen Gelinas, M.D., reviewed Dr. Henderson's records in Manchester's case and concluded that there was no evidence of any "significant physical functional limitations for the relevant period." (AR 534.) The state agency had a Psychiatric Review Technique performed by "CLB" on April 11, 2011. (AR 535-546.) CLB noted that the medical disposition was based on affective disorders, anxiety-related disorders, and substance-addiction disorders. (AR 535.) CLB found Manchester to have depression, a medically determinable impairment that does not precisely satisfy the diagnostic criteria; anxiety, a medically determinable impairment that does not precisely satisfy the diagnostic criteria; and alcohol and benzodiazepine abuse, medically determinable impairments that do not precisely satisfy the diagnostic criteria. (AR 538, 540, 543.) He also found that there was "insufficient evidence" to determine "Paragraph B" limitations or to assess Manchester for the relevant period. (AR 545, 547.) A state agency psychologist, Thomas Conger, Ph.D., "reviewed all the evidence in the file and the [Psychiatric Review Technique Form] of 4/11/2011 is affirmed as written." (AR 549.)

Manchester skipped her April 29, 2011, appointment with Dr. Hinds. (AR 582.) She visited Dr. Hinds again on May 24, 2011. (*Id.*) Dr. Hinds noted that Manchester's old psychiatric records showed prior diagnoses of dysthymic disorder, social phobia, and avoidant personality disorder. (AR 582.) Dr. Hinds performed a mental status examination and found mild psychomotor retardation, anxious and occasionally dysthymic traits, and moderately impaired

insight and judgment. (AR 583.) Dr. Hinds assessed Manchester with major depressive disorder, recurrent moderate; dysthymic disorder by history; generalized anxiety disorder, provisional; history of social phobia, alcohol abuse, and benzodiazepine abuse; borderline personality disorder, provisional; history of avoidant personality disorder; and a GAF of 45. (*Id.*)

On July 5, 2011, Manchester again called her former employer and threatened to kill the staff. (AR 1274.) The police came to Manchester's home, found her in an unstable condition, and called EMS to transport her to UNM early on July 6, 2011. (*Id.*) She was restrained after attempting to bite herself and others, and making suicidal comments to providers. (*Id.*) Manchester was then transferred from the emergency department to Psychiatric Emergency Services for evaluation of suicidal and homicidal intent requiring physical restraint and medication management. (*Id.*) She reported that she was drinking when she made the threatening phone call. (*Id.*) Alicia Burbano, M.D., noted that Manchester reported anhedonia, poor concentration, anxiety, poor energy, and feelings of guilt, hopelessness, and worthlessness. (*Id.*) Manchester's medications at that time included Lexapro, Xanax, metformin,[22] levothyroxine, HCTZ,[23] lisinopril, and gabapentin[24]. (*Id.*)

Dr. Burbano performed a mental status examination on Manchester and found her to be moderately cooperative with fair eye contact and exhibiting signs of mild psychomotor retardation. (AR 1275.) Her mood was "fine." (*Id.*) She had a moderately anxious and restricted affect, mildly disorganized thought process, and fair insight and judgment. (*Id.*) She denied

---

[22] "Metformin" is a biguanide used to treat type 2 diabetes. *Metformin*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (last visited Nov. 4, 2014).
[23] "HCTZ" is short-hand for hydrochlorothiazide. Hydrochlorothiazide is a diuretic used to treat high blood pressure. *Hydrochlorothiazide*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited Nov. 4, 2014).
[24] "Gabapentin" is an anticonvulsant used to treat seizures, restless leg syndrome, postherpetic neuralgia, and diabetic neuropathy. *Gabapentin*, NATIONAL INSTITUTES OF HEALTH, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited Nov. 4, 2014).

suicidal ideation and hallucinations. (*Id.*) Dr. Burbano assessed Manchester with major depressive disorder, recurrent moderate; dysthymic disorder, by history; generalized anxiety disorder, provisional; history of social phobia, alcohol abuse, and benzodiazepine abuse; borderline personality disorder, provisional; dependent personality disorder traits; history of avoidant personality disorder; and a GAF of 45. (*Id.*)

Manchester's husband called emergency services on August 16, 2011, after she assaulted him with a knife and then overdosed on Xanax and an unknown pill. (AR 236-37, 1261.) Manchester was admitted to the UNM emergency room with slurred speech and superficial cuts to her forearms made with a steak knife, and she was not oriented to time. (AR 1262.)

Lindsey Martin, R.N., at UNM Behavioral Health performed an Initial Behavioral Health Screening on Manchester on October 21, 2011. (AR 1255.) Martin diagnosed Manchester with major depressive disorder, recurrent moderate; dysthymic disorder by history; generalized anxiety disorder, provisional; and borderline personality disorder. (AR 1256.) Manchester was cooperative with the assessments, but appeared nervous and reported feeling anxious. (*Id.*)

James Harrington, Ph.D., court psychologist, performed a psychological evaluation on Manchester to determine her eligibility for the Judicial Supervision Program, in connection with her 2009 aggravated assault against her husband. (AR 1348-53.) Dr. Harrington evaluated Manchester on October 13, November 1, and December 7, 2011, as well as on January 18, 2012. (*Id.*) Manchester reported a history of nervousness, anxiety, depression, fearfulness of people, memory problems, self-injuring by cutting her arms, and a history of formal psychiatric treatment beginning after her 1990 suicide attempt. (AR 1349.) Dr. Harrington found that Manchester described symptoms "that are characteristic of a borderline personality disorder, such as mood instability, mood reactivity (especially anger), an unstable sense of self, and self-

mutilation behaviors." (AR 1350.) He also performed mental status examinations on each visit and found that Manchester presented similarly across their four visits. (AR 1351.) She was prompt, cooperative, and friendly, with a generally flat and restricted affect and subdued mood. (*Id.*) She reported significant symptoms of anxiety and being fearful of people, new or strange situations, and crowds. (AR 1351-52.) Dr. Harrington found Manchester competent to stand trial and proceed in the adjudicative process, but noted that she had depressive and anxiety disorders, with a history of dependency on others. (AR 1352-53.) Dr. Harrington found Manchester eligible for the Judicial Supervision Program and she entered the Program for her 2009 aggravated assault on May 12, 2012. (AR 239-42.)

## HEARING TESTIMONY

The ALJ held a hearing on December 13, 2012, at which Manchester and a vocational expert ("VE") testified. (AR 27-56.) Manchester was represented by an attorney. (AR 29.) Her date last insured was June 30, 2010. (AR 30.)

Manchester testified that she last worked in 2006. (AR 31.) She holds two Bachelor's degrees—one in biology and one in medical technology. (AR 41.) Using her education, Manchester previously worked as a medical technologist for several different companies. (AR 31-32, 41-42, 48-49.) Manchester was fired three times from different jobs as a medical technologist because of altercations with coworkers. (AR 49.) She then worked for her husband doing inventory in 2006. (*Id.*) Manchester left the job working for husband because of her anxiety. (AR 49-50.)

Manchester testified to a history of overdosing on various medications, but stated that they were not suicide attempts. (AR 38.) She said that she was "trying to get relaxed and go to sleep so things wouldn't get out of hand with [her] husband[,]" and agreed that many of her

emergency room visits were related to altercations with her spouse. (*Id.*) Manchester admitted to several ER visits, dating from at least 2009, related to mixing prescription medications with alcohol. (AR 40.) Manchester further admitted to a genuine suicide attempt in 1990, stemming from an altercation with her ex-husband. (AR 42-43.) She said that her last misuse of prescription medication was two years before the hearing. (AR 43-44.)

Manchester stated that she has served, cumulatively, three days in jail. (AR 45.) As of the date of the hearing, she was on probation from a charge of aggravated battery against a household member with a deadly weapon. (AR 37, 39, 51.) Manchester testified that she does not remember stabbing her husband in the arm. (AR 51.) She was evaluated by Dr. Harrington and found competent to stand trial. (AR 36.) Manchester recounted her history of anxiety and depression to Dr. Harrington, and stated that she believes it began when she was a child and her family made fun of her. (AR 47-48.)

Manchester testified UNMH would not accept her as a new patient until the battery charge on her husband arose. (AR 50-51.) She stated that this is the only reason she has not been in therapy consistently. (*Id.*) Manchester stated that she is taking twelve medications per day. (AR 33-34.) She takes medications for anxiety and depression. (AR 34-35.) Manchester denied being an alcoholic, despite numerous notations in her medical records of alcoholism. (AR 32-33, 42.) She testified to being in therapy starting from approximately June 2011. (AR 35.) Manchester attends therapy four times per week under the supervision of Michael Bischoff, attending sessions for anger management, changing cognitions, anxiety, and depression. (AR 44.) She testified that she is afraid of things, such as people following her in the car, and that she hears her own voice when she is not speaking. (AR 52-53.)

After examining Manchester, the ALJ questioned the VE. (AR 54.) The VE testified that Manchester's past work experience fit into two categories. First, she qualified as a medical technologist, classified as light, skilled work with a specific vocational preparation of 6. (AR 54-55.) Second, she worked for two years as an inventory auditor, classified as sedentary, skilled work with a specific vocational preparation of 5. (AR 55.)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

As an initial matter, the ALJ stated that Manchester met the insured status requirements through June 30, 2010. (AR 12.) Her January 20, 2011, application alleged disability beginning November 23, 2003. (*Id.*)

The ALJ reviewed Manchester's application for benefits according to the sequential evaluation process. (AR 12-14.) At the first step, the ALJ found that Manchester had not engaged in substantial gainful activity since the alleged onset date of November 23, 2003. (AR 14.) At step two, the ALJ found that Manchester had the medically determinable impairments of hypothyroidism, hypertension, diabetes mellitus type II, a right shoulder injury, depression, anxiety, and alcoholism, dating through June 30, 2010. (*Id.*) The ALJ then concluded that Manchester did not have a severe impairment or combination of impairments that significantly limited her ability to perform basic work-related functions for twelve consecutive months. (*Id.*)

In reaching this conclusion, the ALJ stated that she considered all of Manchester's symptoms that could reasonably be traced to the medical evidence and other evidence. (AR 15.) The ALJ acknowledged Manchester's testimony at the hearing, but found her to be a "poor historian." (*Id.*) The ALJ then noted the two-step process for assessing a claimant's symptoms: 1) determining whether there is an underlying, medically determinable, physical or mental impairment that could reasonably be expected to produce the symptoms; and 2) evaluating the

intensity, persistence, and limiting effects of the symptoms to determine their impact on the claimant's RFC. (AR 15-16.) The ALJ found that Manchester's medically determinable impairments could reasonably be expected to produce her symptoms, but found Manchester to be not credible. (AR 16.)

The ALJ gave "significant weight" to the State agency evaluations from Dr. Gelinas and Dr. Conger regarding Manchester's physical and mental impairments, respectively. (*Id.*)

The ALJ concluded that Manchester did not have an impairment or combination of impairments that significantly limited her physical ability to perform basic work functions. (*Id.*) The ALJ reviewed records from 2002, indicating mild conjunctivitis in Manchester's eyes; from 2004, indicating fatigue and dizziness; from 2007, indicating a swollen knuckle; from 2008, indicating hypertension and diabetes mellitus, type II; from 2009, indicating fatigue, dizziness, and a right shoulder injury; and from 2010, indicating a left-sided maxillary retention cyst. (AR 16-17.)

The ALJ considered the four functional areas of "Paragraph B," used in evaluating mental impairments, and found Manchester to exhibit, at most, mild limitations in those areas. (AR 17.) In support of this finding, the ALJ noted that, prior to June 30, 2010, Manchester sought help from mental health professionals only when she presented at the emergency room for other issues. (AR 18.) For example, the ALJ found it relevant that Dr. Henderson prescribed medications for mental health problems for several years, and diagnosed Manchester with anxiety and depression, but he did not perform a mental status examination. (*Id.*) Manchester has a history of overusing prescription medications with alcohol and presenting at the emergency room. (*Id.*) In 2009, she presented at Lovelace Behavioral Health and denied suicidal intention. (*Id.*) She was diagnosed with alcohol abuse and an anxiety disorder. (*Id.*) Manchester had several

emergency room visits in 2010, and was noted as having a "clinical impression of depression," a non-specified mood disorder, chronic alcoholism, benzodiazepine abuse, an impulse control disorder, a history of kleptomania, akathisia, and a fear of being followed. (AR 18-19.)

The ALJ proceeded to note that Manchester was charged with aggravated battery against a household member in 2011, after she allegedly stabbed her husband in the arm. (AR 19.) Most of Manchester's records reflect the period after the altercation with her husband, and therefore after her date last insured. (*Id.*) The ALJ concluded that these records were not relevant, but proceeded to discuss the psychiatric evaluation by Dr. Harrington from October 13, 2011, through January 18, 2012. (AR 19-20.) Dr. Harrington found Manchester competent to stand trial and noted that she "did not manifest significant deficits due to a mental disorder or to a cognitive disorder." (AR 20.)

Based on her findings at step two, the ALJ concluded that Manchester is not disabled and is not eligible for benefits. (*Id.*) Manchester appealed the decision to the Appeals Council, but the Council found that Manchester's reasons for disagreeing with the outcome did not justify changing the ALJ's decision, thereby rendering the ALJ's decision the final decision of the SSA. (AR 1-5.)

DISCUSSION

Manchester argues that she has been disabled since November 23, 2003. She makes two broad arguments in favor of reversal and remand. First, Manchester argues that the ALJ's finding of no severe mental impairment was contrary to evidence and law. Second, she argues that the ALJ erred by discrediting Manchester's subjective reporting of symptoms. Because I find that the ALJ misapplied the law when she found that Manchester did not have a severe impairment, I do not reach the credibility issue, as it may be affected by the ALJ's treatment of this case on

remand. Because Manchester does not challenge the ALJ's finding with regard to her alleged physical impairments, I will not address those impairments.

Manchester challenges the ALJ's step-two finding of no severe impairment based on misapplication of the law and a finding unsupported by substantial evidence. The legal and factual analyses are inextricably linked in this instance.

The claimant bears the burden of showing that her impairments were severe before the date last insured, that is, that they "significantly limit[ed her] ability to do basic work activity." *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997). The burden of this showing is "'de minimis.'" *Id.* (quoting *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)). The severity determination is based solely on medical factors. *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003). An impairment or combination of impairments significantly limits a claimant's ability to do basic work activities when it impinges upon:

1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
2) Capacities for seeing, hearing, and speaking;
3) Understanding, carrying out, and remembering simple instructions;
4) Use of judgment;
5) Responding appropriately to supervision, co-workers and usual work situations; and
6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521; *see also Williams*, 844 F.2d at 750-51. The ALJ should only find that the impairment or combination of impairments is not severe if they evidence a slight abnormality having no more than a minimal effect on a claimant's ability to work. *See Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). "If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities,

the sequential evaluation process should not end with the not severe evaluation step." SSR 85-28, 1985 WL 56856, at *4 (Jan. 1, 1985).

The ALJ concluded that Manchester had no severe impairments, even though she had medically determinable impairments. In support of this conclusion, the ALJ recited that Manchester had "mild limitations" in each of the four functional areas set out for evaluating mental disorders in the Listing of Impairments. *See* 20 C.F.R., Part 404, Subpart P, Appendix 1. The ALJ also noted that Manchester "only sought help from mental health professionals when she presented to the emergency room." (AR 18.) Finally, the ALJ recited that the "mild objective clinical findings in the evaluations . . . as well as her failure to seek regular outpatient mental health treatment . . . are consistent with no more than 'mild' limitations." (*Id.*)

As an initial matter, the ALJ may not require a claimant to have sought mental health treatment from a psychological specialist before finding a severe impairment. *Fleetwood v. Barnhart*, 211 F. App'x 736, 739 (10th Cir. 2007) (unpublished). *Fleetwood* presented a factually similar scenario allowing the Tenth Circuit to confront the issue of how to handle medical records, including prescriptions, from a non-specialist treating physician. As in *Fleetwood*, medical records from Dr. Henderson show a long history of diagnosing Manchester with depression and anxiety, and providing medications for these ailments. Furthermore, every emergency room visit included some notation of depression, anxiety, or some sort of personality disorder. The ALJ appears to have discounted all of this information for lack of mental status examinations and she engaged in impromptu opining on the impact these issues have on Manchester's ability to work.

While the ALJ states that Manchester had only "mild" limitations, the only available Psychological Review Technique Form marked "Insufficient Evidence" to evaluate the degree of

limitation in each of the four functional areas, and other medical records list GAF scores between 25 and 45, indicating severe impairments. The ALJ further pointed to the absence of "medical source statements from treating sources addressing the claimant's functioning during the relevant period" in support of her finding that Manchester had no severe impairments. "The lack of treatment for an impairment does not necessarily mean that the impairment does not exist or impose functional limitations. . . . [A]ttempting to require treatment as a precondition for disability would . . . undermine the use of consultative examinations." *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (unpublished). The ALJ could have ordered a consultative examination to supplement the record.

Finally, the ALJ noted that many of Manchester's records come after the date last insured of June 30, 2010. Therefore, the ALJ argued that the records are out-of-time with regard to this appeal. However, all of the records before June 30, 2010, are applicable to this case. Even if the ALJ were to discount all records dated after June 30, 2010, Manchester still has diagnoses of depression, anxiety, a personality disorder, a non-specified mood disorder, anger problems, substance abuse problems, and an impulse control disorder. (AR 279-91, 298-310, 315-25, 331-78, 383, 396-97, 399-400, 456-57, 495-96, 513-15, 646, 809-12, 1206.)

In light of the medical evidence and de minimis burden at step two, the ALJ's conclusion was contrary to law and not supported by substantial evidence.

### CONCLUSION

The ALJ erred in her assessment of the severity of Manchester's mental impairments by requiring treating sources and on-going mental health treatment for a finding of a severe impairment. Therefore, I grant Manchester's motion to reverse, and I remand this case back to

the SSA to reconsider the medical opinion evidence with regard to whether Manchester has a

severe impairment and to conduct other proceedings consistent with this opinion.

   IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.